UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELILAH MARIE HAMPTON; and JAMILA BREELER,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN JOAQUIN, et al.,<br><br>Defendants. | No. 2:16-cv-01816-MCE-AC<br><br>**MEMORANDUM AND ORDER** |

Through the present lawsuit, Plaintiff Delilah Marie Hampton seeks damages from Defendants San Joaquin County and fourteen individually-named San Joaquin County Sheriff's deputies, claiming that she was unreasonably restrained by the deputies, and subsequently arrested, after she reportedly caused a scene in a Superior Court courtroom.[1] Plaintiff Hampton claims violations of her constitutional right to be free from unreasonable search and seizure pursuant to 42 U.S.C. § 1983 and further asserts various state law claims for false arrest, imprisonment and battery.  The currently

---

[1] The Court notes that Plaintiffs filed a document entitled Notice of Dismissal as to Certain Defendants (ECF No. 39) on August 22, 2017.  That document purported to dismiss all individual Defendants in this lawsuit (except for Defendant Head) along with the City of Stockton pursuant to Federal Rule of Civil Procedure 41(a).  Under the terms of Rule 41(a), however, Plaintiffs can unilaterally effectuate dismissal absent a court order only before the opposing counsel filed an answer, and review of the docket indicates that answers had been filed before the Notice of Dismissal was submitted.  Accordingly, Plaintiffs must either obtain a stipulation or obtain a court order for any dismissal to be effective.  In the meantime, the Defendants sought to be dismissed remain active on the case docket.

1

operative Second Amended Complaint ("SAC") also claims that Defendant County is liable for wrongdoing for failure to adequately train, supervise and discipline its deputies. In addition, Plaintiff Jamila Breeler asserts her own claim for negligent infliction of emotional distress as a result of contemporaneously observing the injuries sustained by her sister, Plaintiff Hampton.  Defendant County and one of the involved Sheriff's deputies, Defendant Steve Head, now move for summary judgment, or alternatively partial summary judgment, on grounds that they are entitled to judgment in their favor as a matter of law pursuant to Federal Rule of Civil Procedure 56.[2]  As set forth below, Defendants' Motion is GRANTED in part and DENIED in part.[3]

**BACKGROUND**

On March 10, 2016, Plaintiffs went to the Joaquin County Courthouse located at 222 East Weber Street in Stockton, California, to observe a scheduled court proceeding in Department 17.  They entered the courtroom after the morning's calendar had already commenced.  Officer Head, a retired deputy who continued to work part time for the San Joaquin County Sheriff's department on a "per diem" basis, was serving as court bailiff that day.  Defs.' Statement of Undisputed Facts ("SUF"), ECF No. 59-1, Nos. 3, 4, 6.

According to Officer Head, because Plaintiffs walked in after the judge took the bench, they missed the admonition he gave concerning restricted cell phone usage, a warning similar to that provided by other departments.  Id. at No. 10.  It is undisputed that after Plaintiffs took their seats, Head got up from his desk and approached Plaintiff Hampton after he saw her using a cell phone in her lap.  Id. at No. 20.  Head states he

---

[2] The remaining thirteen San Joaquin County Sheriff's deputies named as Defendants are not parties to the present motion, and neither is the City of Stockton or Stockton Police Officer Tess Vallines. Vallines and the City of Stockton are apparently named as Defendants because Officer Vallines was involved in some way in the restraint and subsequent detention of Plaintiff Hampton.

[3] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs in accordance with Local Rule 230(g).

asked Hampton to step outside, where he explained to her that she had missed the warning he provided about cell phone usage in the courtroom and would have to put her device away. Id. at Nos. 27-28. Hampton describes what happened differently, she claims that Head simply told her she "could no longer be in the courtroom," with no explanation whatsoever. Hampton Dep., Ex C. to Decl. of Mark Berry, ECF No. 56-4, 36:10-15.

According to Officer Head, Hampton became upset when told she could not use her phone in the courtroom. He states she used profanity and called him "names" before asking Head to take custody of her phone during the court proceedings. Id. at Nos. 29-30. When Head declined to do so, he claims Hampton asked to go back inside to retrieve her keys since she apparently had nowhere to stow the phone out of public view and would consequently have to take it outside.

The parties' respective versions of what transpired next sharply diverge. Officer Head states he held the door open for Hampton as she went inside. When she passed by, Head states he noted the smell of marijuana on her person and confronted her with that observation, indicating that not only could she not have the cell phone in the courtroom but she could not return either, presumably because he believed she had been smoking.[4]  In response, Head claims Hampton continued to use profanity as she went back into the courtroom to get her keys. Dep. of Steve Head, Ex. B to Berry Decl, ECF No. 56-4, 31:2-9

As she was exiting the courtroom after retrieving her keys, Head states that Hampton increased her gait, turned sharply to the right, lowered her right shoulder, and drove the shoulder into Head's chest as he continued to hold the door open. Id. at 32:4-13.[5] Hampton, for her part, denies that any physical contact took place. Hampton Dep., Ex. A to Decl. of Lyndsie Russell, ECF No. 59-2, 54:3-6. She claims that Head grabbed

---

[4] Hampton, for her part, denied having smoked marijuana that morning. Hampton Dep, 26:15-17

[5] Head described Hampton's maneuver in this regard as akin to a "hockey check" that occurs when a player throws their shoulder into another person's body during a hockey game. Id. at 33:2-5/

her by the wrist for no apparent reason once they were outside the courtroom.  She claims Head then threw her against the wall before using a "chokehold," (which she described as Head having wrapped his arm around her neck and across her chest) to take her to the floor.  Id. at 41:8-42:3.  Head, for his part, claims that when Hampton tried to pull away after he attempted to arrest her in the wake of the above-described assault, he placed her against an exterior wall in a controlled manner.  When Hampton continued to resist, he took her to the floor, also in a controlled fashion.  Head Dep., Ex. B. to Berry Decl., 33:21-35:3.  Head denies either throwing Hampton against the wall or using a chokehold to restrain her.  Id. at 34:3-6.  At this point, he used his radio to request additional backup in handcuffing Hampton.  SUF No. 53.

Sun Cao, an Assistant San Joaquin County Public Defender, was in the hallway adjacent to Department 17 at this time and states he saw "a young African-American female (Hampton) walk out," followed by the bailiff (Officer Head).  He further states that he saw "the bailiff put his hand on the young woman, put her up against the wall, and then take her down to the ground."  Dep. of Sun Cao, Ex. C. to Russell Decl., 5:15-17, 11:11-17.  While Plaintiffs claim Officer Head placed Hampton in a "chokehold," Mr. Cao denied seeing Head place his hand around Hampton's neck.  Id. at 11:18-12:6.

Plaintiff Breeler, who had remained inside, heard Hampton calling her name and went outside to find Officer Head "on top" of her sister.  SUF No. 60.  She pulled her phone out and began to video the remainder of the encounter.  As she did so, other officers began to arrive and Breeler admits she directed both profanity and racial invective to Head in the process.  Breeler Dep., Ex. D. to Berry Decl., 53:10-23, 57:15-18.  When asked if she had observed her sister having sustained any injury, Breeler replied only that she only heard her sister complaining of arm and shoulder pain while being arrested and handcuffed.  Id. at 58:8-19.

Once Head was able to restrain Hampton with the assistance of the other officers, she was taken into custody and ultimately charged with battery on a police officer and

///

4

resisting arrest. Those charges ultimately proceeded to a jury trial following which Hampton was acquitted. SUF Nos. 69-70.

Plaintiff Hampton claims to have sustained soft tissue injuries as a result of the incident, which produced severe pain in the left shoulder as well as pain in the neck and buttocks areas where Hampton claims officers applied their knees as they tried to restrain her. Id. at 67. Officer Head also sustained minor contusions and swelling to his face above the right eye. Id. at 66.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial

responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed

before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A. Liability under 42 U.S.C. § 1983

Plaintiff Hampton's First Cause of Action alleges constitutional violations under the Fourth Amendment for unreasonable search and seizure and is brought under the auspices of 42 U.S.C. § 1983.  In moving for summary judgment, the County alleges that as a municipality it can be liable under § 1983 only if the alleged constitutional injury was a result of a "custom, policy or practice" on its part.  Monell v. Dept. of Soc. Servs., 436 U.S. 658, 695 (1978).  The County claims it is entitled to summary judgment as to the First Cause of Action, as well as the Fourth Cause of Action, which specifically alleges a claim against it under Monell, on grounds that Plaintiff has shown no evidence of the requisite custom, policy or practice upon which liability can be predicated.  In response, Plaintiffs concede that they do not oppose the County's Motion on this point. Pls.' Opp., ECF No. 59, 4:7-10.  Consequently, Defendants' Motion is GRANTED to the extent the County is named in both the First and Fourth Causes of Action.

The present motion's remaining challenge as to the First Cause of Action pertains to the viability of Plaintiff Hampton's claims against Officer Head for excessive force in effectuating her arrest.  As the defense notes, the crucial inquiry in excessive force cases is whether the force employed was "objectively reasonable in light of the facts and circumstances confronting [the officers] without regard to their underlying intent or motivation."  Graham v. Connor, 490 U.S. 386, 397 (1989); Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).  Calculating the reasonableness of the force

7

used "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing interests at stake." Graham, 490 U.S. at 396.  Courts should address the "totality of the circumstances" in making this assessment.  Bryan v. McPherson, 630 F.3d 805, 826 (9th Cir. 2010). Evaluation of whether the force used in any given situation exceeds the proscriptions of the Fourth Amendment generally is made within a three-pronged framework.  As the Ninth Circuit has stated, "[f]irst, we assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." Espinosa v. County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010).  The government's interests are then evaluated by assessing the severity of the crime; whether the suspect posed an immediate threat to officer or public safety, and whether the suspect was resisting arrest or attempting to escape.  Id.  Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion."  Id. at 544.  The Ninth Circuit has described the issue of whether the suspect posed an immediate threat to either law enforcement or to the public as the "most important" factor to be considered.  Bryan, 630 F.3d at 826-828.

       In evaluating Hampton's perceived threat, the defense contends that she "purposely struck HEAD with a lowered shoulder as she left the courtroom," even though in the very next sentence it concedes that there were "no witnesses to this event other than HEAD and HAMPTON."  Defs.' Mot, ECF No. 56-1, 9:23-24.  This underscores the fundamental problem with Head's argument; it literally turns on conflicting "he said/she said" testimony.  As indicated above, Hampton claims that she made no contact with Head as she left the courtroom and that Head's conduct in forcibly restraining her thereafter was completely unprovoked.  Head, on the other hand, describes an apparently purposeful assault where Hampton increased her gait, turned sharply and rammed Head with her lowered shoulder in what he describes as a "hockey check" maneuver.  While Plaintiff claims that the blow above his eye sustained as a result of his encounter with Hampton supports his version of events in this regard, given the tussle

that occurred as he brought a resisting Hampton to the ground it would be sheer speculation to conclude when that injury occurred.

In addition, the force employed by Head in taking Hampton into custody is also a matter of stark dispute. Plaintiff claims Head "threw" her against the wall and then used a "chokehold" to bring her to the floor, whereas Head explicitly denies doing either and contends he brought her to the floor in a "controlled" fashion. The only independent witness to what occurred outside the courtroom between Hampton and Head, Sun Cao, indicates that he did see Head "put" Hampton against the wall, and did see Head take her to the floor, but he denies seeing any chokehold. His version of events, at least on the basis of his deposition testimony, does not unequivocally support either side.

As the foregoing discussion suggests, it is readily apparent to this Court that there are numerous unresolved factual issues that preclude finding in Head's favor, as a matter of law, that the force he used was reasonable. As the Ninth Circuit instructs, in making this determination the Court must look at the "totality of the circumstances" in deciding whether the force used was commensurate with any threat posed to Head by Hampton's conduct. The totality of circumstances here is far too murky to make any determination either way given the record before the Court.

In Gregory v. County of Maui, 523 F.3d 1103 (9th Cir. 2008), the Ninth Circuit recognized that because the balancing necessary to assess whether force employed is excessive typically requires a determination of disputed factual issues, summary judgment on the issue is problematic. As the he Court states:

> "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly" in cases involving claims of excessive force.

Id. at 1106 (quoting Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003)).

This reasoning applies squarely to the present case. Defendant Head's request for summary adjudication as to the First Cause of Action is DENIED.

///

### B.     Qualified Immunity as to Defendant Head

Defendant Head next claims that despite any potential liability for excessive force under the First Cause of Action, he should be entitled to qualified immunity in any event with summary judgment therefore being appropriate.  In the Court's view, the same disputed issues of fact outlined above make that argument unavailing.

The purpose of qualified immunity is to ensure that officers, before they are held liable for constitutional violations, have "fair notice that [their] conduct was unlawful." Brousseau v. Haugen, 543 U.S. 194, 198 (2004).  Designed to ensure that the "fear of personal monetary liability and harassing litigation" will not "unduly inhibit officials in the discharge of their duties" (Anderson v. Creighton, 483 U.S. 635, 638 (1987)), the doctrine confers immunity when "officers' actions does not amount to a constitutional violation, the violation was not clearly established, or their actions reflected a reasonable mistake about what the law requires." Brooks v. City of Seattle, 559 F.3d 1018, 1022 (9th Cir. 2010).

If it were uncontroverted that Plaintiff Hampton had, in essence, assaulted Officer Head as she walked out of the courtroom, Head would have a better argument that his conduct in effectuating her arrest triggered qualified immunity under the circumstances. That, however, is not the situation confronted by this Court in ruling upon the present Motion.  If, as Hampton claims, she did nothing physically to provoke Head, the Court cannot rule out either a constitutional violation or determine that any violation implicit in Head's actions was not clearly established.  The fact that the parties' version of events differs so drastically presents disputed issues of fact that the trier of fact must ultimately determine, as opposed to this Court as a matter of law on summary judgment.  "Where [an officer's] entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." Wilkins v. City of Oakland, 350 F.3d 949. 956 (9th Cir. 2003).  Instead, "only the jury can decide disputed factual issues" that must be resolved before a court can consider whether any resulting violation of Hampton's rights was clearly established.

10

Summary adjudication as to the First Cause of Action on qualified immunity grounds is accordingly also inappropriate.

### C.    False Arrest and Imprisonment

For a Second Cause of Action, Plaintiff Hampton alleges false arrest and imprisonment against Officer Head, as imputed to the County of San Joaquin under a respondeat superior theory pursuant to California Government Code § 815.2. Defendants move for summary judgment, arguing that Offficer Head had probable cause to arrest Hampton for having assaulted him.  Again, Defendants' argument hinges on the Court's acceptance of Head's version of events even though Hampton disputes his account.  It is the function of the trier of fact, as opposed to the court, "to resolve conflicts in the evidence" in false arrest cases.  Levin v. United Air Lines, Inc., 158 Cal. App. 4th 1002, 1018 (2008).  In addition, while Defendants argue that the fact that Hampton's criminal case stemming from this incident was permitted to go to trial is dispositive as to whether Head had probable cause to arrest her in the first place (even though she was ultimately convicted), they cite no authority for that proposition and the Court is aware of none.  Summary Judgment as to the Second Cause of Action is DENIED.

### D.    Battery

In requesting summary judgment as to Plaintiff Hampton's Third Cause of Action, for battery, Defendants explicitly "adopt by reference their arguments in support of dismissal of the first and second causes of action."  Defs.' Mot., 14:28-15:1.  That concession by Defendants that the merits of their argument as to battery rises and falls with the force of their contentions as to the preceding causes of action applies equally to the Court's own determination.  For the reasons already stated, and since those reasons apply equally to Plaintiff's battery claim, Defendants' Motion as to the Third Cause of Action also fails.

### E.    Negligent Infliction of Emotional Distress

In the Fifth Cause of Action, Plaintiff Breeler asserts a claim for negligent infliction of emotional distress under the 'bystander" variant for establishing that tort.  See SAC,

11

¶¶ 46-47.  Under that theory, the bystander must 1) be closely related to the injured victim; 2) be present at the injury producing event and aware that it was causing injury to the victim; and 3) suffer serious emotional distress beyond that typically anticipated for a disinterested witness." Thing v. LaChusa, 48 Cal. 3d 644, 667-79 (1989).

While not disputing that Breeler and Hampton are closely related or that Breeler was present as Head and other deputies sought to effectuate Hampton's arrest, Defendants claim that Breeler nonetheless did not observe any injury-producing event sufficient to satisfy the requirements for the cause of action.  At deposition, Breeler admitted that other than hearing her sister complain of shoulder and arm pain while being arrested and handcuffed, she did not actually see her sustain any kind of injury.  Breeler Dep., 58:11-23.   This is insufficient to meet the rigorous prerequisite for establishing a bystander claim, since it is the contemporaneous observation of actual physical injury, as opposed to ensuing complaints, that must be demonstrated.  See Ra v. Superior Court, 154 Cal. App. 4th 142, 152 (2007) ("It is the traumatic effect of the perception of the infliction of injury on a closely related person . . . that is actionable, not the observation of the consequences of the occurrence…."); Walsh v. Tehachapi Unified School District, 827 F. Supp. 2d 1107, 1125-26 (E.D. Cal. 2011).   Moreover, even assuming Breeler's contemporaneous of the incident was sufficient, as Defendants point out she must still show that she sustained serious emotional distress as a result of the incident.  Mealy v. B-Mobile, Inc., 195 Cal. App. 4th 1218, 1226 (2011). In opposition, Plaintiffs' counsel cites no evidence whatsoever to satisfy that showing.  Breeler's negligent infliction of emotional distress therefore fails for that reason as well.  Defendants' Motion is accordingly GRANTED as to the Fifth Cause of Action.

**F.   Liability Under California's Bane Act**

California's Bane Act creates a private cause of action against anyone who interferes by threats, intimidation, or coercion, or attempts to interfere through such means, with the exercise of rights secured by the Constitution of laws either of the United States or California.  Cal. Civ. Code § 52.1.  In requesting summary judgment,

Defendants argue that there are no facts of any kind to suggest that Plaintiff Hampton was subject to threats, intimidation, or coercion so as to trigger liability under the Act.

Where "an arrest is unlawful and excessive force is applied in making the arrest, [however], there has been coercion independent from the coercion inherent in the wrongful detention itself—a violation of the Bane Act." Bender v. County of Los Angeles, 217 Cal. App. 4th 968, 978 (2013) (internal citations omitted).  As the Bender court noted, the Bane Act may apply if there was a Fourth Amendment violation.  Id.  Given the discrepancies in the evidence and for the same reasons already set forth above, Defendants' request for summary judgment as to the Sixth Cause of Action is also DENIED.

**CONCLUSION**

For all the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 56) is GRANTED as to Defendant County of San Joaquin's inclusion as a Defendant in the First and Fourth Causes of Action.  The Motion is further GRANTED as to the Fifth Cause of Action in its entirety.  Otherwise, Defendants' Motion is DENIED.

IT IS SO ORDERED.

Dated: July 8, 2020

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE